States of America, and we'll hear from Mr. Davidson. Hi, good morning, your honors. May it please the court, I appreciate this opportunity to talk about this case with you today. This is a, my name is Philip Davidson, I'm here on behalf of the minor plaintiff and her mother. This is a case involving a brachial plexus injury sustained at birth, resulting in Erb's palsy. The minor child, Arianna Blanche, was born on April 4th, 2008. This appeal is from a district court decision granting summary judgment. The district court found no question of fact existed as to whether Blanche's claims were timely. And I say claims because one aspect of our brief is that the accrual standard looks at separate claims that are distinct in time, identity, and other aspects separately. It fixes an accrual date separately for those. It's respectfully submitted that the district court improperly resolved inferences and conflicts in the evidence in favor of the government and against the non-movement violation of well-established principles of summary judgment. The plaintiff also respectfully submits that the complaint was filed within two years of the accrual based on the accrual standard that this Seventh Circuit has announced. Mr. Davidson, one thing that's very troubling about this case is that your law firm had all of the medical records here in hand within 19 months of this baby's birth, correct? We had the medical records. By April of 2010, correct? Yes, Your Honor. And I would think that with a new case like this, the most basic step to be taken is to figure out when the statute of limitations will run and not to be aggressive about it. Suit was not filed until 13 months after you had all of those records, and that's why we're having this debate now. That's why we're having this debate, Your Honor, but we need to look at the accrual standard and we need to apply the facts of the case, and I think that the district court's finding that Ms. Blanche had a subjective understanding where that a reasonable person or position would have understood at the time of birth. She consulted counsel within a couple of weeks, right? She did, Your Honor, and I'm glad you brought that up because I wanted to address that. The case law is clear that it is what prompts a putative plaintiff to seek counsel that's relevant to the accrual standard, and Ms. Blanche went to see a lawyer in Joliet who is not a specialist in medical malpractice within a week or two. The meeting went nowhere. Medical records were not ordered. Never saw this man or woman again, and, Your Honor, so I'm citing you to the AQC case. They say we emphasize that it's not the attorney consultation. Right. This case looks a lot like AQC. Well, Your Honor, the district court actually ... AQC is a third district decision. Second circuit. Second. Thank you, Your Honor. The district court actually thought this case looked a lot like Arteaga. It does. I disagree. I disagree that it does, Your Honor, because if the court applied the accrual standard in Arteaga the way that it should have in this case, it would have denied summary judgment because the court said by one year after the child was born, you had done a lot of things. You had retained a lawyer who had ordered medical records and had told you that the case was not meritorious. Despite that, you were still actively seeking referrals because you believed in your case. Second, there was documented evidence in an early interventionalist social worker who where the mother and father had communicated that they felt that there should have been more monitoring, and if there was more monitoring, they would have realized that a vaginal delivery was too risky. They had essentially shown subjective knowledge at that point of their current theory of liability. Now, despite that, the court said by one year out, after all these things have happened, now we will apply the ancillary principle of inquiry notice. At this point, we will apply that. So they didn't find that the circumstances of the birth caused the claim to accrue. In fact, the very same things that were known to the Ortegas would have been known to Ms. Blanche, this single, first-time mother, that it was a difficult delivery, that the baby got stuck, it was important to get it out as soon as possible, and that she felt gratitude to Dr. Marche, the delivering physician, felt that he had saved her life. Now, that's relevant because there was an issue with regard to Dr. Marche apologizing after the delivery, and the government and the district court accepted this argument, said, well, if he apologized, that's an admission of fault. Well, it wasn't an admission of fault, and it wouldn't be difficult for a jury of 12 people to empathize with Ms. Blanche to say... You don't get a jury in this case, do you? We do not, Your Honor. There is a bench trial, but at the same time, that doesn't mean that the case can be summarily dismissed when there are genuine questions of fact, just because there is a bench trial. But Your Honor, I'm not sure exactly how much time I have left, but one issue in this case was that although the district court appeared to pay lip service to the fact that separate and distinct claims should be analyzed separately in terms of fixing an accrual date, they really didn't, and there's two separate claims here. There's a claim against Dr. Marche, which is basically using inappropriate maneuvers, applying too much traction, and against the prenatal caregivers, which is the failure to monitor, the failure to correlate over a period of months clinical findings with ultrasound results. And so, you know, I think that when you look at those separate and distinct in time, identity, and provider, there's nothing about what occurred at the delivery that implicates the prenatal care. I see that I'm eating into my rebuttal time at this point, right? Mm-hmm. You are. And so, I'll leave the floor to counsel. Thank you, Mr. Davidson. Mr. Hale? May it please the court, counsel, the district court in this case properly held that the cause of action accrued in September 2008, shortly following the delivery, because at that time, Blanche was aware of the injury to her child, and she had reason to consider that the injury may have had a doctor-related cause. The injury to the child's arm was apparent from birth, and Blanche testified that she understood that her very large 11.7-pound child had sustained the injury to her arm as a result of the difficult birth where the large child had become stuck in the birth canal for an extended period. As the district court held, it's common sense that the child would not have become stuck in the birth canal if their doctor had opted for a cesarean section rather than a vaginal delivery, and this possibility was highlighted for Blanche during the delivery process where she testified her doctor became very upset over the size of the baby and hollered out repeatedly, who is her doctor, who is her doctor, which she understood he was referencing the prenatal doctor and that he was upset because he had not been advised of the size of the baby so that he could perform a c-section rather than a vaginal delivery. And then that was followed up by the doctor apologizing to Blanche for the injury to her child and for how the child had been delivered. So if there were any doubt as to whether Blanche subjectively suspected a doctor-related cause, it would seem to be resolved by the fact that within one or two weeks after the delivery she went to see a lawyer for the purpose of filing a lawsuit to recover for her child's injuries. And I will mention the comment about the lawyer not being a specialist. That's not in the record. Blanche was asked about questions about the lawyer at her deposition. She didn't, she wasn't able to, she didn't, she said she didn't remember who it was. I agree with opposing counsel that it doesn't really matter whether the lawyer was a specialist. It really was, the lawyer is important only because it demonstrates that Ms. Blanche herself had enough information to consider the fact that she had a potential legal cause. Yes I agree with that. And so the district court probably held that based on those facts there wasn't a legitimate dispute. Let me ask about the, is the apology necessarily an indicator of a doctor-related injury? I think it's one more fact to be put into the equation. You know a doctor could be sympathetic as a plaintiff argues, that would be one thing you could say, but here she described it as an apology which connotes an admission of fault. He just said he was sorry. He just said he was sorry. Doctors are supposed to be sorry when they lose a patient. Right, absolutely. But he said he was sorry for how the baby had been delivered and she characterized it as an apology. Was that a quote? Have you quoted that exactly? What he said? Yes. She said for how, yes that was the word she used for how the baby was delivered and the district court cited that. She said or he said? Pardon? She said, he said for how I delivered the baby? Yes. For how, I think he used a passive tense or a passive form. Give me some briefs. What did she say he said? Well, I see here the district court decision at page six or page 13 of the decision. When I asked her what did you think he was upset about, she said how the baby was delivered, the size. And she wasn't quoting him. Pardon? She was not quoting him in that testimony. No, at that point, that's not directly responsive to what you asked. Okay. So here it is at page 10 of the district court decision. She testified that he told her he was sorry for the birth of her baby and how that she was delivered. And the district court found that strongly suggests that the cause of Ariana's injury was doctor related. You know what the district court found it like? Pardon me? Where did the district court find that language? That was at page, document 68.1 of the record at page 107. That's her deposition. Okay. And that's at page 10 of the district court decision. So that was one of the things the district court relied on. You know, I don't think that that's the main thing. But it's just one more. I think doctors apologizing when they lose a patient is a good thing, not a bad thing. And it should not be taken as a confession of malpractice. Right. I agree for that. But in context, this is a doctor who had been, according to her testimony, had been very upset pointing the finger at the prenatal doctor for not alerting him to the size of the baby so he could have performed a C-section. That's a fair amount of gloss. I would think. But obviously, she's consulting counsel early on there. I'd appreciate it if you could address the issue about whether there is a separate time issue for a distinct claim against prenatal care providers, and in particular, if you'd address what you, something you can call it EY or Wallace. Is it wrong? Should we distinguish it? What do you think? Well, I can tell you to start with the latter question first, just to go in order, that our office disagrees with the Wallace decision. And so we think that it just gets it wrong for how this should work, you know, for the, to start with the Supreme Court's decision. For prenatal and birth-related injuries. Right. So the Supreme Court in Kubrick says that the cause of action accrues when the plaintiff knows about the injury and has reason to suspect a doctor-related cause, and doesn't distinguish in the same way that Wallace did. And so we think that the job of the plaintiff who is suspecting that she may have a cause of action is to consult counsel. And you know, she has two years in which to consult counsel and, you know, and get the investigation started. You know, it's not good to wait till the very last, but, you know, she can, she has some leeway. Once she consults a lawyer, you know, we think that Wallace gets it, isn't really appreciating the practical reality in that, you know, the way a plaintiff's lawyer approaches a medical malpractice case is that everybody is in until they're ruled out. So everybody in sight, that's the rule. Well, not, you know, I appreciate your cases that say you don't want a plaintiff to, you know, take a ghoulish attitude, I think, towards her providers. But here, you know, the plaintiff, her job is to consult a lawyer to figure it out. And a lawyer, well, you know, I think a lawyer, the way a lawyer operates is to sue everybody unless they're ruled out. Used to be one of the great stories about policemen. When you saw a crowd and a policeman arrived, everybody ran, because when a wagon comes, everybody goes. I grew up in a tough neighborhood. So, counsel, if, we may or may not be ready to reevaluate Wallace, but is there a way we could affirm on the prenatal providers here without affirming, without overruling Wallace? Well, the next point I'd make for Wallace is just that what happened here, the fact situation here is very different from Wallace. So Wallace involved different kinds of claims against the prenatal care providers from those against the doctor who did the delivery. Against the prenatal care provider, it was a claim they failed to appreciate high blood pressure resulting in preeclampsia. Against the delivering doctor, it was a failure to perform a C-section quickly enough, you know, figure that out and go. So those were, you know, different kinds of claims. Here, the claim is that the clinic doctors, both the prenatal doctor and the delivering doctor, failed to appreciate the size of the baby so that a C-section could have been performed. So it's really the same claim against the clinic, against all the clinic personnel. And so I think that's distinguishable from Wallace and is not necessarily a claim that's separate evaluation. So that's, so we don't think really Wallace had to be applied here, but of course the district court did apply Wallace and treated it that way. And you know, I think the district court got it right. If there's anybody that Blanche had reason to suspect here, it was the prenatal doctor because according to her, the delivering doctor had gotten upset and was very upset with the prenatal doctor for not advising him of the size of the baby so that he could have performed a C-section. And, you know, I can, her words on that were, you know, when I asked her about that, what she said as to why, I said why at the time, specifically why at the time did you think that he was wanting to know who the prenatal doctor was, and she said, and this is at page 117, line 15, you know, why didn't they, didn't record this, that this was going to be a large baby, that he needs a C-section. I mean, from my perception, that's what I was thinking. So that's what she said was going through her mind, and I think clearly that means that accrues at that time. Thank you, counsel. Thank you. How much time for two minutes, Mr. Davidson, rebuttal? I just wanted to touch on a couple of things that were discussed. First, consulting a lawyer, again, raise your voice. In regards to, you don't have to bend over, just raise your voice. In regards to consulting a lawyer, the Ortega decision, the Ortega's consult to the lawyer, that was not what caused the claim to accrue. In EY, the plaintiffs were pursuing a case against a private hospital institution. That did not cause the claim to accrue. In that case, what caused the claim to accrue is when they ordered the medical records. We're not saying that the claim accrued when we ordered the medical records. Just when Ms. Blanche saw a TV commercial in 2009 that said that these injuries can be the result of malpractice. The other thing is, when she went to see the lawyer, she testified, quote, I went possibly to pursue a case against the hospital. And if we take her words at face value, she was not considering a claim against her prenatal caregivers. You know, one interesting aspect of this case is that Ms. Blanche was asked to speculate in retrospect during the time of her deposition of what she was thinking during this tumultuous and difficult delivery. To me, it's a little bit unbelievable that she came up with the current theory of liability at the time of her delivery. And so, and... You think she had something besides a lawsuit on her mind at the time, huh? I think she did, Your Honor. I think that makes sense. Go ahead. And so, they're not the same claims either. And the plaintiff is not held to the level of a medical expert. Whether there should have been a continuum of care between her prenatal care and her delivery care is separate and apart from whether there was. And Dr. Marche's comments are telling in this respect. He yells out in the middle of delivery, who was her doctor? He had no idea who her doctor was. There was no continuum of care. We're at a different location. The clinic, off-site clinic, hospital is at a different location. Different providers. Dr. Marche had not seen LaToya Blanche until that day, until it was time to push. And different time. If the claim accrued when she saw the infomercial, from which she didn't garner a whole bunch of information, if that was enough to cause the claim to accrue for her, doesn't that mean she was on inquiry notice at least sometime before? She knew about the Erb's palsy. She knew that it was the result of the birth. And reasonable people can disagree on this. But I think at this point, that her suspicion was sufficiently aroused. And she did, in fact, inquire further. She called an attorney, retained him. And so she did meet that duty at that time. So I'd ask that you reverse the district court, and I appreciate your time today, Your Honor. Thank you, counsel. The case is taken.